This is United States Environmental Protection Agency 2460193 and a consolidated case. Mr. Chung. Thank you, your honors. I may please the court. David Chung here on behalf of the industry petitioners. In 2021, EPA developed a first of its kind existing chemical exposure limit known as the ECHL under TSCA for certain uses of chrysotile asbestos. EPA set its ECHL at a level that's 20 times lower than the limit set by OSHA which has for decades regulated workplace exposures to asbestos. EPA concluded that ensuring exposures remain at or below the ECHL will eliminate unreasonable risk. EPA also found the ECHL is achievable and it emphasized the feasibility of the ECHL as demonstrated by the air monitoring data submitted to EPA by the chloralkali industry. Counsel, we gave notice to the parties, to the council, that we're concerned about jurisdiction. Do you want to address that for us? Certainly, your honor. The industry petitioner's standing is self-evident in this case. The industry associations represent member companies that are directly regulated by the final rule. They own and operate facilities that currently use chrysotile asbestos. The final rule bans chrysotile asbestos. Well, counsel, that may well be and what we don't have here is something that case law from the Supreme Court and perhaps this court as much talks about affidavits actually from the individuals who would address what their interests are and how they have been injured. There's nothing like that from from the parties in this case, is there? That is correct, your honor, but I would direct your attention to this court's decision in Texas via Nuclear Regulatory Commission. That's 78 F 4th 827. The pin site is 835 and that case makes it clear that a petitioner need not support its standing by, for example, specific facts in the administrative record or by submitting declarations when standing is self-evident and that comes from some D.C. circuit cases that are also cited in What about the shrimpers and fishermen case? It says citations to specific facts in the record. How are we to draw a line on just assuming away standing, which the Supreme Court has very clearly told us not to do repeatedly, should we just indulge standing as opposed to looking for specific facts in the record? Certainly, your honor. I would begin by noting that up until recently, Olin Corporation was a co-petitioner in this case and we submit that the standing and the injury is self-evident from the record during the briefing in this case. For example, our opening brief at page 75, note 19, provides record sites about how Olin asked for seven years to transition away from asbestos. The final rule provides only five years and that is evident from the briefing in this case because one of the issues in this case is whether the phase-out schedule to move away from asbestos provides a reasonable transition period or whether it is too long and so that is self-evident from the record. I could also... But is Olin no longer part of this case? Yes, that is true that Olin is no longer a party in this case but Olin is a member of Petitioner American Chemistry Council and if it would be helpful to this court, I'd be happy to submit a letter that points to additional record citations or I can provide them now that provide additional citations to the record. In terms of the injury to other additional American Chemistry Council member companies, in the record, for example, JA2208 are American Chemistry Council's comments. It is like a stuffy, Mr. Chung and Mr. Dolanby with Judge Inglehart's indulgence. I don't know how long a list you have. Perhaps we should submit something after argument. I want to submit it to everyone. I don't know if everybody on this side has something similar but submit it also to opposing counsel and they can respond. Yes, sir. Get that to us if you can by the end of the day. Yes. We were advised before argument that we were looking at the standing issue. Didn't the issue come prepared to discuss it? Well, it was. I'm sorry. I can provide just a handful of additional sites if that would be helpful now. You can follow up with the letter but I just wanted to make the record clear that you need some standing. Yes. You can move beyond standing where you want to be, I suppose. Yes. Thank you. Judges, turning to the merits. Again, despite EPA's finding that the ECCL will eliminate unreasonable risk, EPA insists that the only way to ensure asbestos does not present unreasonable risk is through a ban. That's the option that EPA chose. EPA violated Toxica Section 6A by regulating beyond the extent necessary to eliminate unreasonable risk. Beginning with the statute, EPA's interpretation reads the phrase to the extent necessary out of Toxica. Section 6A says in pertinent part that if EPA finds any activity or combination of activities involving a chemical substance presents unreasonable risk to health or the environment, EPA shall apply one or more risk management requirements to the extent necessary so that the chemical substance no longer presents such risk. Under the most natural reading of this statutory command, EPA can impose requirements to the point needed to eliminate unreasonable risk, but if a requirement goes beyond that point, it violates the statute. In some ways, EPA agrees with this reading at page 94 of its brief. EPA acknowledges that an action would be unreasonable, for example, if substantial evidence does not support the conclusion that additional measures are necessary. But EPA's core position is at 97 of its brief, and that is so long as restriction it chooses ensures that a chemical no longer presents unreasonable risk, then Section 6A is satisfied. But Congress could have easily accomplished that result without the limiting phrase to the extent necessary. Congress could have simply commanded EPA to apply one or more requirements so that the substance no longer presents unreasonable risk. EPA's interpretation gives no effect to the words to the extent necessary. Again, EPA found that exposures that remain below the ECCL will eliminate unreasonable risk. That's at Joint Appendix 1547. EPA also found the ECCL's achievable, that's at Joint Appendix 13, and that it is feasible, that's Joint Appendix 19. EPA should have stopped there and restricted the use of crystal asbestos using the ECCL plus mandatory workplace controls. That is the extent of restriction necessary to unreasonable risk. By instead imposing a ban, EPA went beyond the extent necessary. Turning to the substantial evidence arguments in the case, EPA's conclusion is that a ban is the only way to eliminate unreasonable risk, but that is not supported by substantial evidence. As a threshold matter, Your Honors, EPA acknowledges, again at 94 of its brief, that each restriction in a Section 6A rule must be supported by substantial evidence. That evidence is lacking here. EPA's ban rationale essentially boils down to two arguments. First, at JA 13, EPA claims monitoring to or below the ECCL may at times be problematic due to analytical and field sampling challenges. Yet in the very same sentence, EPA proclaims the monitoring is achievable. And elsewhere in the rule, again at JA 19, EPA says industry's own data confirms the feasibility of the ECCL. Thus, EPA's speculation that monitoring may be problematic at times is refuted by the record data and by its own findings on achievability and feasibility. EPA's second rationale is industry data shows that the ECCL is sometimes exceeded. And therefore, the only way to comply with the ECCL is through long-term reliance on the use of respirators, which EPA deems is unacceptable because it says respirators are least effective means to reduce workplace exposures. For starters, EPA's conclusions are hard to square with its own findings about respirators. For example, at JA 1145 to 46, EPA said when expected use of respiratory PPE is considered for some worker tasks, the risk estimates do not exceed the benchmark for unreasonable risk. EPA also recognized in risk evaluation at JA 984 that inhalation exposures can be reduced by a factor of 10 to 10,000, assuming employers institute a comprehensive respiratory protection program, which of course, the rule mandates. The rule requires that regulated facilities have a comprehensive protection program that includes fit testing, respirator maintenance, and training and retraining. That's at JA 40 and it's codified at 751.511F. All of these new requirements, keep in mind, are enforceable by EPA. But more importantly, whether respirators are less effective than other types of controls, such as engineering controls, is really beside the point. The record shows that respirators can still be effective at eliminating whatever residual unreasonable risk might remain after implying other engineering and other workplace controls. There's nothing in the record that says respirators provide zero protection. That's not even EPA's position. In fact, in responding to criticisms about respirators, EPA said if they provided no protection, then OSHA would not mandate their use as a supplement to engineering and work practice controls. That's at JA 2862. The upshot is we don't need respirators to remove all exposures or all risk. The industry air monitoring data, which again, EPA relies on to say the ECCL is feasible, proves that respirators don't really have to do heavy lifting. Almost all of the results in the record, that's at JA 182 to 89, show that current monitoring results are either already below the ECCL, meaning workers don't need respirators to prevent unreasonable risk, or the results are close enough to the ECCL that wearing the least protective respirator that's required under the final rule, which is a protection factor of 10, should eliminate the unreasonable risk. Counsel, let me ask you, if we agree with you, are you seeking that we vacate the rule entirely, or vacate only sections concerning the chloralkali and chemical production industries, or just remand the whole thing to the EPA? Judge Engelhardt, the latter. Not remand, but vacate only the bans as to chloralkali and the chemical manufacturing. And EPA makes the severability argument, and it's answering as to why the whole thing doesn't necessarily need to go down. Turning back to the substantial evidence, EPA's claim that respirators cannot reliably ensure exposures remain below the ECCL appears to rest entirely on a single study. That's the 1998 Riala study at Joint Appendix 4013. First off, the study does not say respirators provide zero protection. Quite the contrary. Most of the respirators in that study reduced exposures by a factor of several hundred or even several thousand. Every respirator study provided some level of protection, even if not always as high as advertised. Secondly, EPA itself largely swats the study aside itself and says only three of the 21 abatement scenarios are even relevant from that study. But as to those three relevant scenarios, EPA never explains how those abatement activities compare to the uses that are regulated in this rule. For example, where employees in that 1998 study properly fit tested and properly trained, how well was the respirator equipment that they were using? What were the limits of detection that they were trying to measure back in 1998? All of these are relevant to assessing just how protective respirators are. To sum up, EPA's conclusion that only a ban will eliminate unreasonable risk is simply not supported by substantial evidence. Thank you. All right, counsel. You ready to proceed? Yeah. Good morning, your honors. I just want to make a general statement. Clement's point this morning. Would you identify yourself for the record, the recording? Mr. Sussman, just wanted you to say your name. Say your name. Just wanted you to say your name for the record. Oh, for the record. Okay. I am Robert Sussman, and I am counsel for several of the petitioners. Thank you. Thank you. We have a recording of this. We wouldn't want you to go unidentified. No, that's very appropriate. Very appropriate. So I'd like to emphasize at the start that our clients support the EPA determinations of unreasonable risk for chrysotile asbestos and the scientific findings on which they are based. Our focus as petitioners is on strengthening the Part 1 rule by addressing asbestos risk scenarios that are outside the scope of the rule. I'd like to start by addressing standing. I represent 18 petitioners. They are a mix of organizations and also individuals who are asbestos scientists and medical doctors. Counsel, would you comment on recently this court in United States versus Texas earlier this year talked about a diversion of resources theory of standing and rejected that. How is your situation, your clients, what is their interest in this case? We are not arguing organizational standing. We are arguing associational standing, which was not an issue, I believe, that was addressed. But it's diversion of resources. The theory is that we have to do other work, more work, alter our game plan, as it were, in order to react to the EPA's actions. That's not what we're here today to argue. And we have addressed standing in our brief. We have submitted three declarations from organizational petitioners. And I think based on those declarations, our position is that those three petitioners are representing members or supporters who would be harmed by the deficiencies in the Part 1 rule. So we are not putting the focus on impacts on resources or advocacy. We do address those issues in our declarations, but we have read the decision and we think the soundest basis for standing in this case is associational standing. Let me ask you, with regard to Part 1, getting back to the, I suppose, the merits, do you dispute that Part 2 addresses the conditions and use of asbestos, the types that you argue are not in Part 1? Well, they don't address the conditions of use of asbestos that we are concerned are not included in Part 1. And I want to explain here that Part 2 is only about legacy asbestos. And legacy asbestos is asbestos that was sold many years ago. It is installed in buildings, pieces of equipment. And the issue is whether the people who work in those buildings or living in those buildings are exposed to the installed or legacy asbestos. Our case on the merits is about current and future commercial uses of asbestos. And that is not an issue that is covered in Part 2. And I would say further that there is no aspect of Part 2 that we are relying on in this case. All of the evidence in the record that we are relying on is in the record of the Part 1 rulemaking. So I think the argument that we are somehow trying to bootstrap Part 2 into changes in the asbestos rule, that is just lacking in merit. It's not the fact. So if I can continue here, what we are talking about in our petition for review is the failure of the Part 1 rule to, number one, address all of the known asbestos fibers. There is a definition of asbestos in TSCA. It includes six different asbestos fibers. And then, in addition, we are saying that the rule does not only address six conditions of use of chrysotile asbestos. And the reason we're concerned about both things is that there is a definition of condition of use in Section 3 of TSCA. And the definition includes uses which are known, which are intended, and here's the most important thing, reasonably foreseen. And so if a use of asbestos is not occurring today, but it might occur next week or next year and there's a reason to believe that it will occur, then that is a reasonably foreseen condition of use and should be addressed in the Part 1 rule. And I would just mention very quickly, this is not a theoretical issue. There are 12 countries around the world that continue to mine and use asbestos. In fact, over a million metric tons of asbestos is produced outside the United States. We're talking about India, China, Russia, and many, many other, many other countries. Okay, Counsel. Thank you. May it please the Court. Nate Finch for United Steel Workers. I have represented many people in jury trials involving mesothelioma victims. A lot of those involve gaskets. And I'd like to address the Court's standing question first, if I may, and then I'll go to the merits. I kind of feel like Goldilocks up here because we're not saying that, we're not challenging the ban, we're not addressing the ban. We're saying that the steel workers need to be protected in the same way that other members in the chemical industry are protected when they remove or replace or install gaskets. And I think of the three parties here, it's clearest that the steel workers have associational standing. Under the United States Supreme Court case in the FDA versus Alliance for Hippocratic Medicine, Justice Thomas, in his concurrence, makes it clear that the three-part test for associational standing is still the law. And that test in the union context, I would point the Court to two United States Supreme Court cases, UAW versus Brock, 477 U.S., 274 in 1986, which cites back to the Hunt versus Washington State Apple Advertising Commission, 432 U.S., 333, 343. And that has a three-part test for when a union has standing to bring a case on behalf of its members. One... Counsel, what I think we're looking at at this stage, and you certainly can finish your point, our concern is that this has not been addressed in the record. This is being raised now, there are no affidavits or declarations or other matters that would support as case law may indicate will have to address that needs to be shown. So... I would respectfully disagree if what you mean by in the record. First of all, the rule itself, which is in the record, talks about how there are hundreds of thousands to millions of these chrysotile gaskets still in place in the chemical industry. And in our motion to intervene, which this is, admittedly for me, it's an unusual proceeding. Normally I'm used to filing a complaint or a motion to intervene in a civil case where it's a pleading. In our motion to intervene, it is a pleading in the case. We specifically state, thousands of USW members are exposed to chrysotile asbestos when oil and fire refineries, chemical plants, and other facilities install new asbestos sheet gaskets or when they are repaired, replaced, or maintain equipment with asbestos sheet gaskets. So that's a motion to intervene. Nobody contested that motion to intervene. The government didn't say you're factually wrong. I think you can accept that as it's just as if in a complaint, you make an allegation and it's not contested. I think that's record evidence that there are USW members. But standing is jurisdictional. We can't just assume it away because there's been no objection or no, it hasn't been raised. Well, if a complaint is, if an allegation, a complaint is not disputed, it's deemed admitted, I would assert. And there's nobody that has objected to or contested that fact. I think you can take that as record evidence of people in the chemical industry who are USW members and a union clearly has the right to assert health and safety issues on behalf of its members. May I? Councilman, why don't you move on from that? We'll work with the answer you gave us. Okay, so on the merits, the nobody is challenging the science of the risk assessment. The industry petitioners dropped their challenge to the risk assessment a few days ago. And so what the EPA found is that the asbestos, the risk of cancer, both when they are installed and when the gaskets are removed. And they're removed by, if your honor is familiar with how a gasket is used in an oil refinery or something, they're between, typically they're in equipment like a pump or a valve or a turbine, their gaskets are between flanges of a steam pipe. And when you have to scrape the gasket off of a steam pipe, off a flange, it releases millions of asbestos fibers into the air. The EPA dealt with this problem kind of in two ways. One, they said for two years, within two years you've got to stop installing new gaskets. And then for the titanium dioxide industry, they said you can keep installing them for four years, but you've got, for five years, but you've got to provide worker protections. And that is, you have to do monitoring that shows that you're below the ECEL, this exposure limit at issue here. And if you can't get to the ECEL, you've got to give respirators and exhaust other sort of industrial hygiene type protections. For whatever reason, they applied those protections to the titanium dioxide part of the chemical industry, but they forgot about or didn't address, didn't create those same protections for the people in the chemical industry who are not in the titanium dioxide industry. And so they, our position is they just drop the ball. And to the extent that they're arguing that, well, they'll deal with it in phase two, part two, legacy asbestos, which is what they argued in their brief. And I'm not sure what they're going to say now, given the time that's elapsed and what they have said publicly in other contexts, which we allude to in our reply brief. I've got five seconds, but the short answer is they made a finding of unreasonable risk in part one. They said that if you install gaskets or you rip gaskets- You have five seconds. You seem to have overlooked that. I used to run track, Your Honor, and five seconds is a long time. I would just rest on our papers and we believe that the EPA doesn't have a good answer to our challenge. Thank you, Your Honor. Good morning, and may it please the court. Laura Glickman on behalf of EPA. I will respond to industry petitioners' arguments and my colleague, Kristen Sarna, will respond to labor and environmental petitioners' arguments. With us at council's table is Derek Gilliam of EPA. We have known for decades that asbestos causes cancer, so much so that it is now used in just a handful of ways. Prior to this litigation, even petitioner ACC said that it supports transitioning away from asbestos in the chloroply industry. The court should deny industry's petitions for two reasons. First, ACC has not met its burden to establish standing in this case. While we thought that petitioner Olin had alleged a valid injury by challenging the timeline for transitioning away from asbestos in the chloroply industry, it has since withdrawn its challenge to the timeline and dismissed its petition in its entirety. Because the chloroply and general chemical production industries plan to transition away from asbestos regardless of this rulemaking, ACC has not established an injury, in fact. Second, even if ACC did have standing, its petition fails on its merits. Substantial evidence supports EPA's conclusion that only a ban will eliminate the unreasonable risk posed by asbestos, and EPA acted within its discretion not to refer the regulation of asbestos to OSHA. First, regardless of the standard used, the record fully establishes that EPA correctly determined that only a ban would eliminate the unreasonable risk posed by asbestos in the chloroply and chemical production industries. In the chloroply industry, workers are exposed to asbestos in multiple ways, including making and taking apart asbestos-containing diaphragms and removing asbestos from those diaphragms. Even when they are not directly handling asbestos, they are still exposed to asbestos fibers that continue to circulate in the air. Respiratory protective equipment cannot eliminate the unreasonable risk that these exposures pose. In fact, a study of the performance of respiratory protective equipment specific to asbestos shows that the majority of the time, respiratory protective equipment fails to sufficiently protect workers. This study is the best available science, and EPA is aware of no data on the other side of the coin, in other words, showing that respiratory protective equipment would, in fact, eliminate the unreasonable risk posed by asbestos. Exposure is even higher for workers who do not wear respiratory protective equipment because it is so uncomfortable, particularly in the high temperatures of chloralkali facilities. These same issues hold true for workers who make and remove asbestos-containing sheet gaskets in the chemical production industry. The question is not whether respiratory protective equipment could eliminate unreasonable risk in theory, but whether it actually will under real-world conditions. Substantial evidence supports EPA's conclusion that the answer to that question is no. And if EPA cannot ban asbestos, it's unclear under what circumstances EPA could ever ban a chemical. Putting aside the issues with respiratory protective equipment, industry itself has raised concerns about its ability to perform the monitoring necessary to ensure that workers are not exposed to cancer-causing levels of asbestos. Second, EPA reasonably exercised its discretion not to refer the regulation of asbestos to OSHA. Section 9A.1 provides that if EPA makes an unreasonable risk finding and determines in the administrator's discretion that action under a different federal law administered by a different agency could sufficiently address that risk. Counsel, what about Section 2608A.4? The TSCA says that the EPA must quote initiate or complete close quote rule making if the other agency doesn't take one of the actions described. How would you deal with that? In other words, does that create a mandatory? Well, it seems that the TSCA contemplates that the EPA may begin make the rulemaking process while the other agency is reviewing its report. Yes, but I think here the discretion provided to EPA and Section 9.8.1 is explicit. And industry's interpretation of Section 9 reads out that discretion and creates, it seeks to create a requirement that EPA refer all workplace-related risk findings to OSHA. But if Congress had intended to create such a requirement, we think that it would have said so explicitly. Instead, it reads out the discretion granted to EPA here. The lack of a referral under Section 9A is not judicially reviewable. It's not included in TSCA's judicial review provision. And the Senate drafters of the 2016 TSCA amendments explained that they intended a referral to another agency to be completely discretionary and not subject to judicial review. But even if the court were to find that the decision is reviewable, the record here supports it. EPA explains that OSHA has not updated the exposure limit for asbestos in over 30 years. And even at the time acknowledged that those exposure limits left significant risk to workers. And here EPA has concluded that only a ban would eliminate the unreasonable risk. But OSHA has said that it does not have the authority to ban asbestos in the workplace. If there are no further questions from the court, I'll conclude for these reasons and more fully explained in our brief, the court should deny industry's petition. We appreciate it. May it please the court, Kristen Sarna on behalf of EPA. This court should deny the steel workers and ADAO's petitions for review. As you have heard, these petitioners agree that the uses of asbestos at issue in this rule should be banned. And they raise only very narrow challenges to EPA's risk evaluation and risk management rule. The record here supports EPA's course of action. EPA has complied with its statutory obligations and had substantial evidence to do so. I would like to begin by discussing the arguments raised in ADAO's petition, and I will then turn to the arguments raised in the steel workers petition. However, before I turn to the merits, I would like to address the questions this court has raised regarding standing. As you have pointed out, petitioners bear the burden to demonstrate that they have standing. Here, ADAO has not done so. In light of this court's recent en banc decision in United States v. Texas, ADAO's allegations that it will have to reallocate resources and redouble efforts based on the asbestos part one rule is insufficient to show that it has suffered an injury. This is a generalized grievance with EPA's course of action in the part one rule. Furthermore, neither the unions of firefighters nor the individual researchers and physicians can establish an injury in fact. However, if the court finds that ADAO has standing, the court should still deny this petition because EPA properly excluded discontinued uses, because EPA properly varied compliance deadlines, and because EPA addressed environmental releases through the ban that it imposed. First, EPA properly treated discontinued uses of asbestos as unforeseeable uses in the part one rule. In particular, EPA properly relied on its asbestos significant new use rule to conclude that discontinued uses were not foreseeable uses of asbestos. Discontinued uses are... Do you have a question, your honor? Discontinued uses are uses with both no known use and no known manufacturer. In 2019, EPA issued its asbestos significant new use rule under TSCA section 2604A2. The significant new use rule prohibits manufacture, import, and processing of asbestos for discontinued uses from restarting without providing EPA with an opportunity to evaluate that intended use for its unreasonable risk and to take any necessary regulatory action. Because of the significant new use rule, EPA concluded in the part one risk evaluation that discontinued uses were not reasonably foreseeable for evaluating whether asbestos poses an unreasonable risk. And contrary to what ADAO suggests in its brief, the significant new use rule does not merely require manufacturers to notify EPA of new uses of asbestos. Rather, once notice is provided under section 2604A3, EPA must review that notice and EPA must determine whether the use presents an unreasonable risk. If EPA finds there is an unreasonable risk, then EPA must take action to protect against such risk. ADAO seeks to call into question the legality of the significant new use rule based on this court's decision and enhanced technologies versus EPA, Fifth Circuit decision from 2024. However, this case is distinguishable. Unlike an enhanced, the asbestos significant new use rule is forward-looking. It regulates uses that are neither ongoing nor already prohibited and it therefore does not present the same due process concerns that were at issue in enhanced. The significant new use rule is a proper use of EPA's section 2604 authority and EPA properly relied on it to conclude that discontinued uses were not reasonably foreseeable. Turning next to the varying compliance deadlines for the chlorophyll industry and the final rule, EPA complied with section 2605D1 and had substantial evidence to support the varying compliance deadlines. There are two compliance technologies that can replace asbestos diaphragms in chlorophyll production, non-asbestos diaphragm cells and membrane cells. Due to limited suppliers, the required technical expertise and permit requirements, conversion of membrane cells takes longer because it must occur sequentially. Based on these differences in the final rule, EPA contemplated five years for conversion to non-asbestos diaphragms and a staggered schedule of 5, 8 and 12 years for conversion of membrane cells. TSCA and section 2605D1E directs EPA to provide for a reasonable transition period and section 2605D2 expressly provides that compliance dates may vary as determined by the administrator. Here EPA had a valid basis for varying the compliance deadlines. It was permitted to do this by statute and it properly can consider the environmental and health benefits of the technology that would take slightly longer to convert using. Finally, EPA accounted for environmental exposures to the risk management rule. Pursuant to sections 2605B and 2608B1, EPA tailored the scope of its risk evaluation and did not evaluate exposures to the general population. However, EPA accounted for any risks from these exposures in the risk management rule. By banning the uses of asbestos, any potential exposures to the general population were adequately addressed and these bans take effect as soon as practicable. By eliminating the use, a ban necessarily eliminates the risk. Additionally, as EPA explained in the risk evaluation, these exposure pathways were already well regulated under other EPA statutes. Therefore, EPA's risk management rule accounts for environmental exposures and it complies with TSCA. I'd like to next turn to the arguments raised in the steelworkers petition. Steelworkers petition should be denied because EPA considered interim workplace protections for the non-titanium dioxide industry and found that they would not have been supported by substantial evidence. This decision was a logical outgrowth of what was proposed in the proposed rule. EPA complied with TSCA in imposing interim protections for the titanium dioxide industry and not imposing interim protection or in imposing interim protections for the titanium dioxide industry, but not for the rest of the chemical manufacturing industry. For titanium dioxide, a ban on the use of asbestos containing gaskets that took effect in five years was appropriate, while for the broader chemical manufacturing industry, it was appropriate to ban the remarks and in reply. They are challenging EPA's failure to implement worker protections for as long as the gaskets remain in use, so not for the two-year period before the ban took effect. However, as EPA explained throughout the record, there is no unreasonable risk posed by the ongoing use of asbestos containing gaskets. Rather, the risk is posed at two points, at installation and at removal. Therefore, the only remaining risk that EPA would need to address from asbestos effect is solely the removal of those gaskets. And as explained throughout our brief, EPA considers the removal of these remaining gaskets to be a legacy use and will therefore be addressed in the Part 2 risk evaluation and the forthcoming Part 2 risk management. Do you have a reaction to Council for Steelworkers' argument about standing, that their uncontested motion to intervene set out enough? We would disagree with their characterization that merely taking no position automatically means that we admit those allegations. As has been pointed out, petitioners bear the burden to prove that they have standing and to make specific allegations about that standing. We have not raised a specific challenge about the allegations that the steelworkers have provided thus far, but believe that they still need to present specific allegations showing the harm they've suffered from this rule. And the unresponded to motion doesn't suffice as your position? That is correct, Your Honor. All right. I'd like to move finally just to speak a little bit more about those interim protections and about Part 2, just to clarify some kind of about failing to address these legacy gaskets. EPA has been very clear about what was addressed in the Part 1 risk evaluation and what will be addressed in the Part 2 risk evaluation. It's stated in the preamble to the Part 1 risk evaluation very clearly that legacy uses will be addressed in a separate rulemaking. So there has not been any harm suffered yet here. EPA is still going to address any harm from legacy uses in a forthcoming Part 2 risk management rule and any arguments that petitioners have with respect to the removal of legacy gaskets should be raised at that time. When is Part 2 coming out? EPA has issued a Part 2 risk evaluation and then it is still currently in the process of working on the risk management rule to address the risks identified in the Part 2 risk evaluation. I don't have a specific timeline that I'm able to provide the court for when that will be finalized. Do you have an estimate? I don't, Your Honor. Anything else for us? Nothing else, Your Honor. All right, Kelsey. Thank you. Thank you. Mr. Jones. Thank you, Your Honors. Just a handful of points in response to my colleague's arguments. First, on standing, EPA concedes that a shortened timeline for Olin to transition away from asbestos demonstrated its standing. The remaining industry petitioner's standing is self-evident for the exact same reasons. The final rule on its face shows why petitioners are injured by a shortened timeline to transition away. Recall, in the final rule, EPA assumes that the industry is transitioning away from chrysotile asbestos in the coming decades. That's at JA2 and JA26 to 27. And then EPA goes on to say we're going to assume the baseline for transitioning is in the billions of dollars, yet there are incremental costs on top of that baseline for shortening the timeline and having to transition in as little as 5 to 12 years. That proves the injury and that is why the remaining petitioner's standing is as self-evident as Olin's was initially. On the merits arguments, EPA claims that, EPA seems to be claiming in its briefing in today that we can't trust that workers are going to wear respirators. For starters, that's not in the final rule. That wasn't EPA's rationale in either the rule or the response to comments that we can't trust that workers are going to follow the rule which mandates the wearing of respirators if monitoring data comes back under the ECHL. This court explained in corrosion-proof fittings at 1222, note 22, that you can't justify a ban on the assumption that EPA is not going to enforce its newly promulgated requirements to wear respirators. So that we submit the rationale is both post hoc and foreclosed by this court's decision in corrosion-proof fittings. Third, EPA argues that ACC itself raised concerns about the monitoring data and whether they could feasibly measure down the ECHL. But the most important response is that's not EPA's finding. EPA disagreed at JA2788 and specifically said the ECHL's achievable both on an eight-hour measurement as well as on a short-term measurement. And then again, JA19, EPA is relying on the actual monitoring data that industry compiled between 1996 and 2016 to say that shows this level is feasible and that you can measure that low. It's understandable why industry commenters that were opposing a new first-of-its-kind very stringent exposure limit would raise arguments about feasibility. But at the end of the day, ACC's comments at JA2409 say that whatever concerns and whatever challenges there are about compliance to monitor that low can be overcome. ACC's poor position was just not sensible to have to do that. Finally, if this court finds that it has jurisdiction over ADAO's petition and if this court also finds that EPA lawfully banned asbestos, it should nevertheless reject ADAO's challenge to the phase-out schedule for chloralkali facilities. ADAO's petition fails on the text of the statute alone. The plain language of Section 6D makes it clear that speed is not the only consideration when EPA sets compliance dates. While EPA told Congress to set compliance dates, I'm sorry, while Congress told EPA to set compliance dates that are assumed as practicable, it also mandated that EPA provide for a reasonable transition period. That is a provision of the statute, 6D1E, that ADAO has never mentioned in its brief and did not get the chance to mention today. But secondly, also a textual argument is that in deciding what dates are assumed as practicable, EPA is informed by the factors in Section 6C2, such as likely effects on environment and the public health. That comes through throughout the record, for example, JA2734, as well as JA12 in the final rule. EPA was worried that imposing shorter deadlines would mean at least one facility, if not several, would be taken offline if the transition period was too short. That would have, quote, deleterious impacts on the supply of chemicals for water treatment, as well as the chemical industry. Now, finally, ADAO tries very hard to equate practicable with feasible. That also fails on the text alone. Up until 2016, Section 6D, in fact, said compliance dates as soon as feasible. If ADAO is correct that feasible has a very well-established meaning under the OSHA Act and OSHA case law, Congress deliberately moved away from that body of case law in 2016 when it took feasible out of the statute and replaced it as soon as practicable. On balance, if you read Section 6 as a whole and the command that EPA provide a reasonable transition period, the flexibility to do different compliance dates for different persons, it becomes clear that the text firmly allows EPA to do what it did in this rule, which is different compliance dates for the chloralkali industry. Thank you. Your Honors, I'd like to come back to the condition of use issue and whether the resumption of previous asbestos uses is reasonably foreseen and therefore needs to be addressed in the Part 1 rule. I think one of EPA's big responses is that the agency promulgated a rule in 2019, a significant new use rule for asbestos, and their argument is that under the rule, future imports and uses of asbestos that are not covered by Part 1 are prohibited. I think a very important answer to that is this Court's decision in 2024 in the Enhance versus EPA case in which this Court overturned a significant new use rule by EPA, and it said very plainly that a significant new use rule cannot apply to a previously occurring use. And the Court was very explicit about that. It said that the SCRUR was not the right vehicle, that Section 6 was the right vehicle for dealing with formerly existing but now suspended uses, and I think under that decision, the simple answer is that the SCRUR that EPA is relying on, the 2019 SCRUR, is void and unenforceable. I see no other conclusion that the Court can reach on the basis of the 2024 decision. All right, Counsel. Thank you. May it please the Court, Nate Finch for the Steelworkers. The EPA did a risk assessment and found an unreasonable risk whenever gaskets are removed, and there was no distinction in that risk assessment between the titanium dioxide aspect of the chemical industry or the chemical industry generally. Nothing in the preamble to nothing in the comments, nothing said that it wouldn't, that the unreasonable risk which the EPA found somehow doesn't apply anymore. Legacy asbestos doesn't, Part 2, doesn't address the risks that EPA found in Part 1. It found the risk, and the harm is 18 months ago, workers protections went into place for chemical industry people in the titanium dioxide industry, but they didn't go into the place for the rest of the industry. So the USW steel workers are being exposed to asbestos on an ongoing basis, but they don't have the worker protections in place that the rest of the chemical industry does. I'm not sure what your argument is about the legacy. You heard opposing counsel say this morning that this would be addressed in the legacy. Is it that they have been inconsistent and they have addressed it for titanium workers but not for you, or is it also that it won't be addressed in the legacy? Legacy doesn't deal with the, legacy asbestos doesn't, the Part 2 risk assessment is out, and it doesn't deal with the gaskets that are being installed and used and removed and replaced in the chemical industry because that was already taken up and dealt with in Part 1. They should have provided the same level of worker protections to everybody in the chemical industry when they found the unreasonable risk. But the legacy asbestos is for insulation that's in buildings that's been there for 50 years, not for you're putting chrysotile gaskets into a machine in an oil well facility, and therefore there's ongoing exposure when it's removed. And that's what we are complaining about, and that's what they don't have a good answer for. Once they found the unreasonable risk, they got to do something about it, and they did. And as to the standing point, I would just make the point that United States versus Texas wasn't a challenge to an agency rule. And up until, we thought our standing was self-evident based on the United States Supreme Court's cases in Brock and Washington. And I think the motion to intervene, if that had been a sworn declaration, which I wasn't aware of any Fifth Circuit rule that required you to have a sworn declaration at the time the briefing was to establish your standing. But we would respectfully request we could submit that same allegation we have in our motion to intervene as a sworn declaration by the end of the day tomorrow. That would certainly establish standing under any test that I'm aware of. But back to the final point is once the EPA found that there's a risk for gasket removal in the chemical industry, they had to do something about it. They did it, they protected the titanium dioxide workers, but not all the other workers that are going to be exposed to asbestos on an ongoing basis. Thank you. Unless your honor has any further questions. No, thank you. This is for all petitioners, I suppose. Tell Mr. Chung to, I think it was, provide something by the end of the day. Any petitioners who think there was something in the record supporting standing for your parties, you have the same deadline and certainly submit to the other side. Whether the panel will want briefing or anything else, we will alert you to that later. That's it for this group.